UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| GEORGE WASHINGTON, | ) | |
| | ) | |
| v. | ) | Criminal No. 03- 41-P-H |
| | ) | Civil No.   08-293-P-H |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

George Washington, a/k/a Anthony Long[1], has filed a 28 U.S.C. § 2255 motion seeking

relief after he was convicted by a jury of distributing cocaine base for two different transactions,

one occurring on April 15, 2003, and another on April 23, 2003.  Washington's 28 U.S.C. § 2255

pleadings charge counsel with performing below the Sixth Amendment standard for effective

assistance by inadequately advising him on the pros of pleading guilty given his sentencing

exposure;  assert that counsel made cumulative errors amounting to a Sixth Amendment

shortfall;  and maintain that he is factually innocent of the crime of conviction. In an allowed

amendment, Washington claims that counsel was ineffective because he did not properly

research how the sentencing guidelines would apply to his sentence, i.e., his exposure under the

career offender guideline.[2]  I recommend that the Court deny Washington 28 U.S.C. § 2255

relief.

---

[1]     The Pre-sentence Investigative Report also lists "Stephen Washington" as an alias but that name does not play a part in the facts pertinent to this 28 U.S.C. § 2255 motion.

[2]     The procedural history of this 28 U.S.C. § 2255 motion is as follows.  On Washington's first direct appeal, the First Circuit remanded the case for reconsideration in light of United States v. Booker, 543 U.S. 220 (2005). United States v. Washington, 434 F.3d 7, 17 (1st Cir. 2006). An amended judgment entered on May 31, 2006. (Crim. No. 03-41, Doc. No. 229.) Washington appealed again and the amended judgment was affirmed.  United States v. Washington, 220 Fed. Appx. 1 (1st Cir. 2007).  (See Crim. No. 03-41, Doc. Nos. 230, 249).  Washington then filed a petition for certiorari review which was denied by the United States Supreme Court on October 1, 2007. Washington v. United States, 128 S. Ct. 325 (Mem.).  On February 28, 2008, Washington filed a pro se motion to reduce his sentence in light of an amendment to the crack cocaine guidelines. (Crim. No. 03-41, Doc. No. 267.)

## DISCUSSION

### *Factual Background*

The testimony of Confidential Informant (CI) Toby White and Washington's co-defendant Alvin Jackson, as well as the use of audiotapes at trial are central to Washington's 28 U.S.C. § 2255 claims discussed below.  The First Circuit Court of Appeals summarized the factual background relevant to the § 2255 merits discussion below as follows:

> Washington was convicted upon the testimony of a government informant, Toby White, to whom Washington sold over 35 grams of crack on two different days (12.8 grams on the first occasion and 23.7 grams on the second), as well as on the testimony of law enforcement agents and cooperating co-defendants, audiotapes of the two transactions, and associated telephone calls.
>
> The first transaction was on April 15, 2003 at 20 Knox Street, Apartment 301, in Lewiston. There … informant White purchased from Washington 12.8 grams of cocaine for $700.
>
> The "next time" came soon, on April 23, 2003. White had called Washington to buy more drugs, and they had agreed to meet on April 23 at Washington's apartment at 67 Pierce Street in Lewiston. This time White purchased 23.7 grams of crack cocaine from Washington for $1300.
>
> The principal, but not sole, defense theory was that someone named "Tony" may very well have sold the drugs, but that Washington was not that "Tony." There was defense evidence that Washington was in Massachusetts on April 23 and so he could not possibly have been the same "Tony" who sold the drugs to White that day. But the prosecution had evidence that on April 23, shortly after the transaction, Lewiston police officer Wayne Clifford visited Washington's apartment on a ruse. The man whom Clifford recognized as "Anthony Long" came to the doorway, identified himself as Anthony Long, and confirmed that no other black man lived in the apartment or had stayed there that day. Clifford made an in-court identification of the man he saw that day as the

---

That motion was denied on March 6, 2008.  (Crim. No. 03-41, Doc. No. 269).  On March 21, 2008, Washington filed a third notice of appeal.  United States v. Washington, Crim. No.03-41-P-H (D. Me.), No. 08-1384 (1st Cir.); (Crim. No. 03-41, Doc. No. 271). On August 28, 2008, the third appeal was submitted to a panel of the appellate court for decision without argument.  The United States filed supplemental authority on December 31, 2008.

This 28 U.S.C. § 2255 motion was filed on September 8, 2008, prior to a judgment on that direct appeal. The United States took the position that this Court did not have jurisdiction over Washington's § 2255 proceeding because this third appeal was pending in front of the First Circuit, even though that appeal addressed his crack cocaine sentence and the present 28 U.S.C. § 2255 motion does not raise a concern about the role crack cocaine played in his sentence. Citing the most orderly administration of criminal justice, I entered an order staying this action until the pending appeal was final. The First Circuit resolved that direct appeal as follows: "A sentencing court has no authority under 18 U.S.C. § 3582(c)(2) to re-sentence crack offenders who were sentenced as career offenders." (Feb. 20, 2009, J. at 1, Doc. No. 301)(citing United States v. Caraballo, 552 F.3d 6 (1st Cir. 2008)).

defendant, Washington. White, too, made an in-court identification of Washington as the man who had sold him cocaine.

Washington and others were arrested on June 3, 2003. Washington identified himself as Anthony Long when he was arrested.

The jury was played the audiotapes of the April 15 and April 23 transactions, as well as tapes of conversations between Washington and White setting up the April 23 deal.

Washington focuses on the fact that the jury was also played audiotapes of eight telephone conversations between White and Jackson that occurred on April 13, 14, and 15. In these conversations, White and Jackson discussed a potential drug deal, which ultimately came to be the April 15 transaction. The two also engaged in casual conversation about a variety of other subjects. Washington did not participate in these conversations and was not mentioned by either his real name or his alias. The prosecution did not intend to introduce the tapes of the April 13 and 14 conversations, but did so because the defense wanted the tapes in evidence.

Id. at 9- 10 (footnote omitted).

### *Washington's 28 U.S.C. § 2255 Grounds*

#### A.  Ineffective Assistance Claims

With regards to my 28 U.S.C. § 2255 review of Washington's ineffective assistance grounds, the First Circuit summarized the standard for 28 U.S.C. § 2255 ineffective assistance claims in United States v. De La Cruz:

> The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.  Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). In order to prevail, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). In other words, a defendant must demonstrate both seriously-deficient performance on the part of his counsel and prejudice resulting there from.

514 F.3d 121, 140 (1st Cir. 2008).

"When a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing."  United States v. McGill, 11 F.3d 223, 225 (1st

3

Cir.1993)(citations omitted).  "A district court may forego such a hearing when 'the movant's allegations, even if true, do not entitle him to relief, or ... [when] the movant's allegations "need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible." ' " Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (quoting David v. United States, 134 F.3d 470, 477 (1st Cir.1998)); see also McGill, 11 F.3d at 225 ("In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations…") (citations omitted).  Furthermore, when a "petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." McGill, 11 F.3d at 225.

### 1.  Performance apropos the possibility of pleading guilty

Washington's first 28 U.S.C. § 2255 thrust is that Washington expressly directed counsel to inquire about a plea deal with the United States and counsel "acknowledged Washington's desires, however never did convey any possible plea agreement."  (Sec. 2255 Mem. at 3.) It is Washington's calculation that he could have worked a plea agreement that reflected the seriousness of his charges, avoided the 21 U.S.C. § 851 enhancement, and realized a three-level reduction for acceptance of responsibility.  He also represents that his attorney advised him that his sentence would turn on drug quantity and that he estimated that Washington's sentence exposure would be in the range of 140 to 175 months.  Accordingly, Washington maintains, he went to trial believing he could not get more than 15 years.  (Id. at 3-4.)  Washington is serving a 360-month sentence.

The United States insists that this Court "need not" and "should not find Washington's assertions" concerning his interest in pleading guilty, "to be particularly credible." (Gov't Mot. Summ. Dismissal at 23.) It cites Washington's perchance for false identities and his insistence before the Court during the sentencing phase that he was not the person convicted of multiple prior convictions.  (Id.)  It has never been this court's approach to the factual representations made in 28 U.S.C.  § 2255 proceedings to somehow discount the pleading/paper averments and make credibility determinations based on the nature of a defendant's efforts of defense vis-à-vis the underlying criminal charge or his sentencing exposure.  First Circuit precedent requires that I accept factual averments as true, subject, of course, to the well-worn exceptions for conclusory allegations and so forth.  Mack v. United States, 635 F.2d 20, 27 (1st Cir. 1980).   The United States also points out that Washington has failed even to allege that there ever was an offer on the table for defense counsel to convey.  (Id. at 24.)  This is a bit of a black hole with regards to this § 2255 claim; on this record I have no way of adjudging what the plea possibilities were between defense counsel and the prosecution at the time.   The United States has not supplemented the record with an affidavit from defense counsel telling his side of the story, nor has it made any factual representations about what the prosecutor in charge was or was not willing to do regarding securing a guilty plea.

The United States further contends that there is an inconsistency in Washington's insistence that he is actually innocent and his professed willingness to plead guilty to the charges; it wonders if the Court would have accepted a plea given Washington's claim of actual innocence and questions whether  Washington was ready to misrepresent material facts in a Rule 11 proceeding.  (Id. at 24-25.)  What is more important in terms of counsel's performance, the

5

United States suggests, is that competent counsel would have had serious compunction about placing a client professing actual innocence before the court to plead guilty.  (Id. at 25.)

In addition, the United States maintains that "Washington has provided no support for his conclusory statement that, but for the alleged misinformation about sentencing, he would have received a lower sentence," noting that most likely he would not have been eligible for a U.S.S.G. § 3E1.1 reduction given his ongoing claims of innocence.  (Id. at 26.)  It further notes that there is no showing that he would not still have been subject to the § 851 information and his career offender status.  (Id.)  "Washington's claim of prejudice," it summarizes, "relies upon layer and layers of speculation."  (Id.)

While I recognize that his is not the ideal record on which to recommend summary dismissal of this claim, I do not think that Washington has adequately demonstrated an entitlement to an evidentiary hearing.  See McGill, 11 F.3d at 225-26[3]; see also 28 U.S.C. § 2255(b); Rule Governing Sec. 2255 Proceedings 8.  In reaching this conclusion I note that in

---

[3]    McGill is the First Circuit's key case on the burden of demonstrating an entitlement to an evidentiary hearing in the context of 28 U.S.C. § 2255 proceedings.  The Panel explained:

> When a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing. See Mack v. United States, 635 F.2d 20, 26-27 (1st Cir.1980); United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir.), cert. denied, 439 U.S. 834, 99 S.Ct. 115 (1978). In determining whether the petitioner has carried the devoir of persuasion in this respect, the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets. See Mack, 635 F.2d at 27; Otero-Rivera v. United States, 494 F.2d 900, 902 (1st Cir.1974). Moreover, when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing. See DiCarlo, 575 F.2d at 954-55.
>
> We have distilled these principles into a rule that holds a hearing to be unnecessary *226 "when a § 2255 motion (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and records of the case." Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir.1974). In other words, a "§ 2255 motion may be denied without a hearing as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of facts, contradict the record, or are 'inherently incredible.' " Shraiar v. United States, 736 F.2d 817, 818 (1st Cir.1984) (citations omitted); see also Rule 4(b), Rules Governing Section 2255 Proceedings.

Id.

his reply memorandum Washington does not mention this claim, let alone rebut the United

States' arguments that his assertions are too conclusory and speculative.  I fully recognize that

there is law in support of Washington's position that a plea deal may have been attainable, even

though he maintains his actual innocence, see, e.g., United States v. Rashad, 396 F.3d 398, 400-

03 (C.A.D.C. 2005); see also cf. Parsley v. United States, Civ. No. 08-88-P-H, 2008 WL

5273320 (D. Me. Dec. 18, 2008;  2009 WL 837714 (D. Me. Mar. 27, 2009) (recommended

decision), adopted (Doc. No. 42), however, the bottom line is that Washington would have been

in the same sentencing ballpark whether or not he pled guilty in view of his criminal history and

the United States' position on the non-availability of the U.S.S.G. § 3E1.1 reduction for

acceptance of responsibility upon a plea qualified with protestations of innocence and denial of

prior convictions.[4]

---

[4]      The PSI shows that Washington's career offender status bumped his offense level up from 32 to 37.  (Rev.
PSI ¶¶ 20-25.)  The preparer noted with respect to an adjustment for acceptance of responsibility:

> Washington took his case to trial and was found guilty by jury verdict.  Pursuant to defense
> counsel, the defendant did not discuss the offense conduct since he will be appealing his conviction in this
> matter.  This writer attempted to interview the defendant in the presence of defense counsel, on November
> 19, 2003, at the Maine State Prison in Warren, Maine.  The defendant refused to answer [any] questions
> about his personal history or circumstances.  Washington stated he did not see any relevance that disclosing
> personal matters would have to his sentence and asserted it would only be used to generate further
> problems in his life by the government.

(Id. ¶ 12.)  The report also contained the following comment on an adjustment for obstruction of justice:

> The Probation Office directs the Court's attention to U.S.S.G. § 3C1.1, Application Notes f, and h.
> In the defendant's objections, he contests numerous convictions as "not suffering" them.  Should the Court
> find that the defendant, in fact, suffered these convictions via an evidentiary hearing, then the Probation
> Office opines the Court can add the obstruction of justice enhancement as the defendant would be
> providing materially false information to the judge and the probation officer in respect to the Presentence
> Investigation for the Court.

(Id. ¶ 11.)

### 2.   Counsel's alleged cumulative trial errors resulting in conviction

Washington next maintains that his attorney made numerous errors during the trial that, while not in and of themselves sufficient to establish a Sixth Amendment claim, cumulatively do so.[5]

With respect to the Strickland performance inquiry, it must be stressed with regards to Washington's cumulative ineffective assistance claim that facially strategic choices fall within the range of Sixth Amendment reasonableness.  See Strickland, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'") (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

"'Strickland clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced.'" Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) (emphasis added) (quoting Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir.1989)); see also Martin v. Grosshans, 424 F.3d 588, 592 (7th Cir. 2005).   And an aspect of the inquiry of Strickland prejudice apropos such cumulative claims is "the strength of the prosecution's properly admitted evidence."  Smith v. Thompson, No. 08-1425, 2009 WL 1285839, 4 (1st Cir.

---

[5]      In a sort of preamble he points out that prior to trial he complained to the trial judge about his attorney's failure to support his alibi defense and his unwillingness to object to the make-up of the jury pool.  (Sec. 2255 Mot. at 6.)  Washington seems to be referencing Docket No. 81, his pro se challenge to the jury pool.  With respect to that filing, this Court entered the following order:

> The defendant has a right to be represented by a lawyer or the right to proceed pro se, he does not have the right to do both simultaneously. Currently, he has a lawyer, Attorney Peter Rodway. The Clerk shall send a copy of this letter to the defendant's lawyer, but it will otherwise be disregarded and considered stricken. The defendant shall proceed through his lawyer unless and until he is permitted to proceed without a lawyer.

(Crim. No. 03-41-P-H, Doc. No. 83.)

8

May 11, 2009) (unpublished opinion). With regards to Washington's sufficiency of the evidence

claim on direct appeal the First Circuit stated:

> Washington argues that insufficient credible evidence supported the jury verdict finding him guilty on two counts of possessing cocaine with intent to distribute. We treat as preserved Washington's claim that the evidence was insufficient as to both the April 15 and April 23 transactions. We review de novo, see United States v. Rodriguez-Casiano, 425 F.3d 12, 14 (1st Cir.2005), inquiring whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," United States v. Casas, 356 F.3d 104, 126 (1st Cir.2004) (quoting United States v. Henderson, 320 F.3d 92, 102 (1st Cir.2003)). All "reasonable evidentiary inferences" are to be drawn "in harmony with the verdict," and "all issues of credibility" are to be resolved "in the light most favorable to the government." Id.
>
> The prosecution's evidence has already been detailed, and it is more than adequate to support the conviction. Washington argues that White was "highly impeached" and that the testimony of various witnesses was inconsistent in "critical aspects," but the jury was entitled to believe the basic story testified to by each of the government's witnesses.
>
> As for White's credibility, defense counsel had ample opportunity to, and did in fact, point out his receipt of government money and his history of questionable behavior. The jury nevertheless found White credible, and this "plausible credibility determination[ ] cannot be disturbed on appeal." United States v. Soto-Beniquez, 356 F.3d 1, 52 (1st Cir.2003); see also United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir.2000) (rejecting defendant's argument that the witnesses were "bad people who should not be believed," where "the jury was presented with substantial evidence of the criminal histories of [those witnesses], including ample cross-examination"). The jury was also entitled to believe the other government witnesses' "version of the facts, at least in its core elements." Torres-Galindo, 206 F.3d at 140. The testimony of the cooperating co-defendants was corroborated at trial, and Washington has, at most, pointed out minor inconsistencies that fall far short of rendering the testimony facially incredible. See id. (stating that even "the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible").

Washington, 434 F.3d at 15 -16 (footnote omitted).

Setting forth his specific sub-claims pertaining to counsel's performance in this cumulative ineffective assistance ground, Washington articulates as follows.[6]

### a.   **The five-part cumulative ineffective assistance of counsel claim**

i.   <u>Failure to procure an expert to analyze or enhance the audiotape evidence</u>

Washington leads with a complaint that his attorney should have mounted a more effective challenge to the use of the audiotapes of conversations prior to the two charged transactions used at trial.  Specifically he asserts that counsel should have procured an expert to analyze the tapes and /or had family members who were present during his trial testify in refutation of the United States' assertion that the voice on the tapes was Washington's.  In the alternative, Washington maintains that counsel should have moved to exclude the tapes because they were not clearly discernable to the jury.   "The tapes were admitted,"  Washington notes, because his attorney "made a deliberate strategic choice that the tape should be admitted to establish an unsavory tone which would damage White before the jury."  (Sec. 2255 Mem. at 7.) Washington complains that "counsel had no remedy for the amount of damage it would cost the defendant."  (<u>Id.</u>)  He insists that this was not sound trial strategy as Washington had requested funds for an expert from the court and money was made available, citing Doc. No 70, yet counsel did not pursue expert services or make use of family members. (<u>Id.</u> at 7-8.)

Document Number 70 is an <u>ex parte</u> motion for additional private investigation funds.  It reveals that the defense was originally granted $1000 to investigate allegations made against Washington, that that sum had been exhausted principally on finding individuals who could testify for the defense, and that it would like another $1000 for the remaining investigation in

---

[6]      The United States has cut-and-diced Washington's ground using a different five prongs. (<u>See</u> Gov't Resp. at 20.)  I have tracked his own characterizations of the subdivisions of his cumulative ineffective assistance of counsel claims.

anticipation that the Jencks Act disclosures would reveal further witnesses.  The United States

Magistrate Judge entered an endorsement order granting the motion in part, indicating that he

authorized an additional $500 without prejudice to Washington seeking additional funds on a

showing of good cause.

> As the United States points out, in closing argument defense counsel stressed:

>> What I've tried very carefully or very hard to do in this case is provide you with information about other ways to investigate drug cases. <u>If the government chooses not to videotape, if the government chooses to give you these audiotapes that you can't hear, if the government chooses to rely only on informants, they do so at their own peril</u>. They can do things to make positive IDs, and they have not done that in this case.

(Jury Charge/Closing Argument Tr. at 40, Doc. No. 179) (emphasis added).

> With regards to the other issues surrounding the tapes and counsel's performance, the

United States stresses that when the defense discovered that a tape had "omissions of concern"

counsel moved to suppress the evidence, the tape was re-recorded, and played to the jury to the

satisfaction of defense counsel.  (Gov't Mot. Summ. Dismissal at 29.) This is proven out by the

transcript of the motion hearing. (Oct. 3, 2003, Tr., Doc. No. 193.)  This transcript also bears

witness to defense counsel's efforts to have the entire tape/transcription of the White/Jackson

conversation on August 13 played because the portion sought to be redacted by the prosecutor on

the grounds of that it contained inflammatory language would reveal to the jury "the

deceitfulness of Toby White."  (Id. at 14-15.)  As the United States summarizes, quoting <u>United

States v. Ortiz Oliveras</u>, 717 F.2d 1, 3 (1st Cir. 1983): "The tapes were highly relevant to the

defense's aim to cast White as a deceitful and unsavory character.  Such a tactical decision, wise

or unwise, successful or unsuccessful, cannot ordinarily form the bases of an [ineffective

assistance of counsel] claim."  (Gov't Mot. Summ. Dismissal at 29.)

11

     **ii.**  Failure to cross-examine Alvin Jackson counter to Washington's directive to do
         so

With respect to the cumulative claim, Washington's next attack on counsel's performance is that his attorney did not cross-examine Alvin Jackson at all even though Washington directed him to do so. He explains:

> According to Jackson on the day of [the April 15, 2003] drug deal he was in the Lewiston apartment with [the} CI … . The government did not ask Jackson if he knew Washington or whether Washington was at the April 15, 2003, drug transaction that he attended. After the government completed its direct examination, Washington was anxious to examine Jackson whom Washington had never seen previously.
> Amazingly, counsel refused to ask Jackson any cross-examination questions much less the ones posed by Washington.

(Sec. 2255 Mem. at 8.) Washington has attached an affidavit by Jackson that states that he never had seen Washington prior to June 3, 2003, and that he did not see Washington in the apartment where [the] drug deal allegedly took place.  (See Jackson Aff., Civ. No. 08-293-P-H, Doc. 1-4.) Washington asserts that he told his attorney to ask Jackson when he had met Washington and the circumstances surrounding the occasion and to inquire whether there could have been another "Tony" who supplied cocaine to CI White on April 15, 2003.  "It should be noted," Washington argues, "that Washington presented an alibi defense at trial and there was evidence that another individual named 'Tony' was around the area during [the] time of the alleged drug transaction." (Sec. 2255 Mem. at 10.)

The United States responds that defense counsel "zealously cross-examined virtually every Government witness excepting the chemist and Jackson.  (Gov't Mot. Summ. Dismissal at 29-30.)

The transcript of the trial does indicate that defense counsel did confer with Washington prior to telling the Court that he declined to cross-examine Jackson.  It appears from the closing

arguments of Washington's attorney that his tactic was to stand on the failure of the United

States to elicit testimony from Jackson that he actually saw Washington during his presence in

the Knox Street apartment:

> They go back to Blake's apartment. Now Brown says that Toby White
> comes back into the apartment. Blake says on a different occasion than in court
> here that Toby White comes back into the apartment, and then George
> Washington shows  up. Well, Jackson's the guy that says I got the drugs, come on
> right back.
> How come Jackson doesn't say a word about George Washington. He was
> there, he was the one that was setting this whole thing up. If it was George
> Washington, why doesn't Jackson talk about George Washington, he testified
> here, the government had a chance to ask him questions, and he never said a word
> about George Washington.
> Now the government attorney, Mike Conley, a minute ago, told you that
> it's a minor inconsistency whether Toby came in first and then George
> Washington followed or it was the  other way around. That's not a minor
> inconsistency, you  know why, because these agents were all on the street
> conducting surveillance. And not one of them saw George  Washington come
> walking up to 20 Knox Street. Not one of  them.  So if George Washington was
> there, how come Jackson  doesn't say he was there, how come none of these
> agents,  these trained DEA agents, good cops, well trained cops, smart guys,
> didn't see George Washington come walking up.
> That's reasonable doubt, ladies and gentlemen, that's big time reasonable
> doubt.

(Jury Charge/Closing Argument Tr. at 32-33.)

Indeed, counsel may have been concerned about opening a can of worms by asking the

questions proposed by Washington.  Prior to Washington's trial Jackson pled guilty based on a

September 26, 2003, Prosecution Version that represented that on April 15, 2003, Jackson went

with White into the Knox Street apartment and White "met two black males, one of whom was

George Washington, a/k/a Anthony Long."  (Jackson Prosecution Version at 3, Crim. No. 03-41,

Doc. No. 76.)    The transcript of Jackson's September 26, 2003, change of plea hearing reveals

that Jackson assured this Court that everything in that document was true to his own personal

knowledge.  (Sept. 26, 2003, Rule 11 Tr. at 11, Crim No. 03-41, Doc. No. 171.)  Washington

does not represent that counsel had knowledge of the representations made by Jackson in his June 2006 affidavit at the time of Washington's October 2004 trial.

Not only has Washington failed to meet his burden under the <u>Strickland</u> performance prong, in terms of this sub-claim's prejudice contribution, this possible area of cross-examination was not only fraught with some risk but there was also very minimal impact to be had even if counsel could have had Jackson articulate the representation contained in his affidavit on cross-examination  in view of the testimony of Blake, Brown, and White as to Washington's participation in the April 15, 2003, transaction.

> iii.   Failure to properly investigate and prepare for trial by interviewing and calling certain defense witnesses and failure to adequately buttress Washington's alibi defense

Another affidavit stars in Washington's third layer of his cumulative ineffective assistance claim.  He submits -- this time with respect to the April 23, 2003, charged conduct at 67 Pierce Street --  that Shanon Lambert would have testified that Washington was at her residence on this date but he was not the African American male present between 2:00 p.m. and 2:45 p.m. (Lambert Aff. ¶ 5, Civ. No. 08-293-P-H, Doc. No. 1-5.)   In the affidavit Lambert indicates that Washington's attorney never interviewed her and that she has personal knowledge that Washington is innocent of the charges he is serving his sentence on.  (<u>Id.</u> ¶¶ 6, 7.)[7]

Washington points to the trial testimony of James Rogers, Lambert's brother, in support of his contention that Lambert had other black males at her apartment.  In general terms Rogers describes most of the visitors to his sister's house as being black males.  (Oct. 16, 2004, Trial Tr.

---

[7]     Washington expands on the facts supported by the Lambert affidavit indicating that Lambert would have made clear that the "Tony" at her apartment around 2:30 p.m. on April 23, 2003, was not Anthony Long/Washington but was "Yet another Tony." (Sec. 2255 Mem. at 10.) Lambert does not discuss another Tony in her affidavit.

at 348-49, Doc. No. 137.)[8]  He testified that a couple of the guys who would show up were named Tony and one who Rogers had heard called Tony went by the street name Tomcat.  (Id. at 349, 352.)  Washington further notes that CI White did not indicate that the person at the April 23, 2003, buy was Tony but instead described him as a "'Black male, with low hair cut, and a goatee."  (Sec. 2255 Mem. at 11) (citing Oct, 14, 2004, Trial Tr. at 136, Doc. No. 135.)  He insists that because White had enough visual contact and conversation with Tony vis-à-vis the April 15, 2003, drug buy -- referring to him as Tony on that occasion – there is reason to question why he would use a description rather than a name in discussing the second buy, thereby raising the specter of reasonable doubt.

What is clear from Washington's own citations to Rogers's testimony is that counsel did elicit testimony towards trying to convince the jury that there were other African Americans who often visited Lambert and that some of these individuals were also named Tony.   The fact that CI White used a description of Washington rather than one of his names does not carry the defense-favorable wallop that Washington imagines.  To the extent that Washington is arguing that there were other witnesses that could have supported his claim that there was a mix-up as to the identity of the person involved in the April 23, 2003, buy, he has not presented the names of possible further witnesses who could have so testified beyond Shanon Lambert.

In the next layer of this cumulative ineffective assistance of counsel claim, Washington faults his attorney for not adequately presenting his alibi defense.   Washington insists that he was not at the Knox Street apartment at 2:35 p.m. on April 23, 2003, but was in Boston and that he returned just after 6:00 p.m.  He points to the availability of the testimony of James Rogers to

---

[8]        The docket lists this transcript as a partial transcript when in fact it is a full transcript of the testimony at trial.  The docket also includes additional transcripts for October 14 and October 16 setting forth the portions of trial that are not evidentiary, i.e., the opening statements, the jury instructions, and  the closing statements.

the effect that at least two other 'Tony's visited the apartment on a regular basis. "Counsel failed

to adequately present these facts that are in harmony with testimony." (Sec. 2255 Mem. at 13.)

Washington explains:

> Lewiston police Officer Wayne Clifford was a key witness for the Government, in that there had been no identification made of the individual who sold cocaine to undercover operative Toby White on April 23. The result of Officer Clifford visited only said (sic), no other black male lived there, it did not say "Tony" Anthony Long, was the "Tony" there at 2:35 April 23, Washington stated to Officer Clifford no other black male had stayed in the apartment that day, Washington was not home at the time in question, so to his knowledge no Black male had stayed at his apartment that day. Washington's whereabouts on April 23, 2003, around 3:45 puts him in Boston, Massachusetts. Only Shanon Lambert who was home could attest to this, and she's willing to testify in court, yet counsel failed to put her on the stand. (see [Lambert Aff., Doc. No. 1-5]).Counsel by failing to present this to the open court for the jury to decide all these above facts in their proper context, greatly prejudice[d] Washington, as well as the jury did not find Washington's alibi defense credible in its presentation.

(Id.)

> The United States responds:

> The Constitution … guarantees only an "effective defense, not necessarily a perfect defense or a successful defense." Scarpa [v. Dubois], 38 F.3d [1,]8 [(1st Cir. 1994)]. Review of counsel's performance is deferential, id., and the record here demonstrates that defense counsel appropriately described during opening statements the mistaken-identity and alibi defenses that would be presented and then proceeded to elicit during cross-examination and the defense's case evidence supporting those defenses. The record demonstrates that counsel put the facts "in harmony" during closing remarks in order to argue that … one of the multiple "Tony"s about whom the jury had heard, committed the offenses and that Washington was in Massachusetts when he was alleged to have distributed drugs to White on April 23. The jury did not believe it and instead credited the testimony of White, Brown and Blake, along with the tape recordings of Washington arranging the April 23 transaction, that implicated Washington.

(Gov't Mot. Summ. Dismissal at 32-33.)

The United States is absolutely correct on this score.  The record reveals defense counsel was focused on demonstrating the prosecution's proof shortfalls vis-à-vis Washington's whereabouts at 2:35 p.m. on April 23, 2003.

   iv. Failure to request an alibi instruction

Washington's final beef with counsel included in this cumulative ineffective assistance ground targets the failure of his attorney to request or object to the absence of an alibi instruction.   There is no question that counsel did not ask for such an instruction.

The pattern jury instruction for the First Circuit on an alibi defense is: "One of the issues in this case is whether [defendant] was present at the time and place of the alleged crime. If, after considering all the evidence, you have a reasonable doubt that [defendant] was present, then you must find [defendant] not guilty."  Pattern Jury Inst. Dist. Cts. 1st Cir. 5.01.  The comment observes:  "A defendant is entitled to a special instruction that on the issue of alibi a reasonable doubt is sufficient to acquit." Id. cmt. (citing Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995), United States v. Simon, 995 F.2d 1236, 1243 (3d Cir. 1993), United States v. Hicks, 748 F.2d 854, 858 (4th Cir. 1984), United States v. Burse, 531 F.2d 1151, 1153 (2d Cir. 1976), and United States v. Megna, 450 F.2d 511, 513 (5th Cir. 1971)).

The United States' approach to this sub-claim is that there was probably a very good reason for Washington's attorney not to insist on the alibi instruction:

> [A]s Washington concedes (Mem. 14), courts have cautioned that an alibi instruction can implicate concerns that the jury will mistakenly believe that a defendant's failure to prove the alibi defense is evidence of guilt, which would result in impermissible burden-shifting. McGonagle v. United States, 137 Fed.Appx. 373, 377 (1st Cir. 2005)(unpublished). It is not clear, therefore, whether defense counsel's failure to request such an instruction was a tactical one deserving of deference. Regardless, Washington cannot establish any error, let alone any prejudice, resulting from the absence of such an instruction. See, e.g.,

> McGonagle, 137 Fed.Appx. at 377 n.5 (citing United States v. McCall, 85 F.3d
> 1193 (6th Cir. 1996)(holding on direct appeal that omission of alibi instruction is
> not plain error when jury is otherwise correctly instructed on government's
> burden of proof and defendant is given full opportunity to present alibi defense in
> closing argument). Washington has never challenged the adequacy of the jury
> charge on the Government's burden of proof. Indeed, defense counsel emphasized
> that burden and the presumption of innocence during his closing argument.
> McGonagle, 137 Fed.Appx. at 377.

(Gov't Mot. Summ. Dismissal at 33-34.)  I do not see the failure to request the alibi instruction in

the context of this record as running afoul of either of the Strickland prongs.

### b.  *Summation of the Cumulative Ineffective Assistance Claim*

Clarifying these five identified spokes of Washington's cumulative ineffective assistance

of counsel claim and spinning them in the context of the record of his criminal case vis-à-vis

counsel's efforts to defend Washington on these two counts, I am fairly confident that the trial

judge would conclude that Washington's attorney performed well within the parameters of Sixth

Amendment competence in defending his client during the trial proceedings.  Furthermore,

because of the strength of the United States' case against Washington that is not impacted by the

five sub-claims set forth above, I am certain that Washington has not met a Strickland prejudice

showing, see  Smith,  2009 WL 1285839 at  4; Washington, 434 F.3d at 15 -16.

### 3.   Counsel performance vis-à-vis Washington's career offender status

With respect to Washington's final Sixth Amendment gripe with counsel, there seems to

be some confusion between the court and the United States as to the impact of my order allowing

Washington's amendment to the § 2255 motion.  (Doc. No. 7.)  In his December 29, 2008,

motion to amend Washington clearly faults counsel for not making an argument to the court

during sentencing vis-à-vis his career offender status.  (Mot. Am. At 2, Doc. No. 7-2.) United

States v. Boardman, 528 F.3d 86 (1st Cir. 2008), the case most relied on by Washington in his

efforts to attack counsel's performance, is clearly a case that addresses the sentencing phase of performance rather than plea agreement issues.  The same is true for the other circuit cases cited by Washington -- United States v. Rodriguez, 527 F.3d 221 (1st Cir. 2008), United States v. Politano, 522 F.3d 69 (1st Cir. 2008), United States v. Martin, 520 F.3d 87 (1st Cir. 2008), and the Sixth Circuit's split decision in United States v. Pruitt, 545 F.3d 416 (6th Cir. 2008) --   as well as the United States Supreme Court cases he relies on -- Gall v. United States, 552 U.S. 38 (2007) and Kimbrough v. United States, 552 U.S. 85 (2007).  It is clear that Washington's intention is to fault counsel for not challenging the use of at least one of his predicate offenses as a violent felony for purposes of his Career Criminal status.   See Chambers v. United States, __ U.S. __, __, 129 S.Ct. 687, 693 (2009) ("For these reasons we conclude that ["failure to report" for penal confinement] falls outside the scope of ACCA's definition of "violent felony." )[9]; Begay v. United States, __ U.S. __, __, 128 S.Ct. 1581, 1583 (2008) ("The question in this case is whether driving under the influence of alcohol is a "violent felony" as the Act defines it. We conclude that it is not.")

This court entered a well-considered published order on the United States' motion for a determination in advance of sentencing as to whether certain convictions qualify as career offender predicates.  It concluded that it did not need to reach the issue of whether or not unarmed robbery was a qualifying predicate offense.  Washington's career offender status was not based upon that conviction, although the government claimed that it qualified as a second predicate offense.  See United States v. Washington, 324 F.Supp.2d 48, 48 -50 (D. Me. 2004).  This Court concluded that Washington's prior conviction for assault and battery with a

---

[9]     Washington actually cites to the Seventh Circuit opinion, United States v. Chambers, 473 F.3d 724 (7th Cir. 2007), that was reversed by the Supreme Court.

dangerous weapon (see PSI ¶ 35) was a "crime of violence" within the embrace of U.S.S.G. § 4B1.1.  Id.[10]

This Court is well aware of the efforts that defense counsel did make with respect to challenging Washington's career offender status.   See McGill, 11 F.3d at  225 (1st Cir. 1993) ("Moreover, when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing.").  Beyond citing case law in his motion to amend his 28 U.S.C. § 2255 motion, Washington does not explain how his attorney could have mounted a better challenge than he did.  He rests on an assertion that counsel in the cases he cites did a better job for their clients in challenging predicate offense than did Washington's counsel.  It is evident from the record in the criminal case that this ineffective assistance claim is meritless.

## B.  Actual Innocence

Washington lists an actual innocence claim in his form petition relying only on his conclusory argument that this ground is supported by his "overall cumulative error argument." (Sec. 2255 Form at 8.) He does not address this ground in his memorandum in support of his motion.

The United States points out that there is a contradiction between Washington's representation that he would have pled guilty to the charges and his contention that he is actually innocent of the charges.  In response Washington opines:

> In its Motion for Summary Dismissal, the government, at length, attempts to
> define an ambiguity between Petitioner's repeated claims of innocence versus his

---

[10]        There was no challenge to the other predicate offense, a controlled substance felony.

> complaint that his attorney failed to solicit a plea agreement for consideration. The government is no doubt aware that fully 95 to 98 percent of all Federal cases are resolved by plea agreement.  This fact being more or less common knowledge, it should be readily apparent that effective representations should include plea negotiations, and those negotiations should be in defendant's best interest and fully reviewed and explained to him.  In view of Mr. Washington's lengthy sentence, a negotiated plea may well have benefited him.  Mr. Washington would not be the first innocent man who made a tactical decision to plead guilty under a particular set of adverse circumstances.  If Bureau of Prison records are correct, the statistics indicate that 1 of 100 inmates are, in fact, innocent of the charges against them.  It can be assumed that many, if not most, of those innocent inmates chose to accept a plea agreement.  In face of all this, Mr. Washington fails to discern any ambiguity involved here.

(Reply Mem. at 2.)

I have already discussed the issue around Washington's ability to plead to the charges even while maintaining his innocence when addressing Washington's first 28 U.S.C. § 2255 claim.  And while I recognize the possibility that Washington could have attempted to enter such a plea, I see a contradiction in his position that he would have entered such a plea and his argument that he could be entitled to 28 U.S.C. § 2255 relief on a claim of actual innocence.  Had Washington entered such a plea he could not now challenge that conviction on a claim of actual innocence without facts surrounding the plea agreement suggesting a grave miscarriage of justice.  Having concluded that his cumulative ineffective assistance of counsel claim is without merit, I do not hesitate in rejecting his assertion that the identified cumulative errors made by counsel support an actual innocence claim. See Bousley v. United States, 523 U.S. 614, 623 (1998); see cf. Schlup v. Delo, 513 U.S. 298, 327 (1995); Walker v. Russo, 506 F.3d 19 (1st Cir. 2007); compare United States v. Barrett, 178 F.3d 34, 48 -49 (1st Cir. 1999) with Bailey v. United States, 516 U.S. 137 (1995); Triestman v. United States, 124 F.3d 361 (2d Cir. 1997).

*Conclusion*

Based upon the foregoing, I recommend that the Court deny Washington's 28 U.S.C. §

2255 motion. I further recommend that a certificate of appealability should not issue in the event

Washington files a notice of appeal because there is no substantial showing of the denial of a

constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, within ten (10) days of being served
with a copy thereof.  A responsive memorandum shall be filed within ten (10)
days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 28, 2009

22